## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF GEORGIA
## COLUMBUS DIVISION

| | | |
|---|---|---|
| GLOBAL PAYMENTS INC., a Georgia corporation, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | CASE NO: |
| JEREMY GRUNZWEIG, | ) ) | |
| Defendant. | ) ) ) | |

## <u>COMPLAINT</u>

Plaintiff Global Payments Inc. ("Global") files this Complaint for breach of contract and seeks preliminary and permanent injunctive relief, money damages, and attorneys' fees and costs against Defendant Jeremy Grunzweig ("Grunzweig"), and states as follows:

## <u>NATURE OF THE ACTION</u>

1.

Global is a leading worldwide provider of payment technology services, embedded e-commerce solutions, integrated payment solutions, point of sale payment solutions, multi-platform payments solutions, and software solutions. Specifically, Global provides payment solutions for credit cards, debit cards, electronic payments, and check-related services in the financial services, gaming, government, healthcare, professional services, restaurant, retail, education, not-for-profit and utilities industries. It provides services across a range of channels to merchants, including, but not limited to, authorization, electronic draft capture, file transfers to facilitate funds settlement and other related services, such as payroll, chargeback and retrieval resolution, point of sale solutions, and software integration.

2.

In November 2015, Grunzweig was hired by Heartland Payment Systems, Inc. ("Heartland" or "HPS"), which was subsequently acquired by Global in April 2016, into the position of Senior Vice President of the Retail Division of Heartland's point of sale business unit, called Heartland Commerce.  In this leadership role within Heartland Commerce, Grunzweig was expected to build the Retail Division both organically and through acquisitions.  An authentic duplicate of Grunzweig's offer letter from Heartland, setting these duties and expectations, is attached hereto as Exhibit A.

3.

In December 2015, Global announced its plans to acquire and merge with Heartland.  In April 2016, upon the close of the acquisition, Grunzweig became an employee of Global and remained in the same role with the same responsibilities as Senior Vice President of the Retail Division of Heartland Commerce.

4.

In October 2018, following Global's acquisition of SICOM Systems, Inc., Heartland Commerce rebranded itself as Xenial, Inc; Grunzweig's role expanded to include the international business expansion of Xenial's software product lines; and Grunzweig's title changed from Senior Vice President of the Retail Division of Heartland Commerce to Senior Vice President of Retail and International for Xenial, Inc.

5.

In April 2019, Grunzweig changed roles within Global's Xenial business unit to become the Senior Vice President, Food Service Management Business Unit.

6.

During his employment in these high-level leadership and management roles within Global, Grunzweig was responsible for providing strategic direction and planning for Global's overall retail sales strategy and revenue generating operations, including for self-service kiosks, point of sale software and hardware solutions, and back office and analytical solutions to small, mid-market, and enterprise-level retail customers in numerous verticals, including, among many others, restaurant and hospitality, apparel and accessories, jewelry, hardware, specialty stores, sporting goods, health and beauty, toys and games, kiosks, and e-commerce and online marketplaces.  Grunzweig was directly responsible for Global's retail point of sale strategy and the development of an enterprise-level point of sale solution, a single omnichannel commerce platform designed to integrate and manage all aspects of retail business, from single stores up to franchise and enterprise-level operations.

7.

During his employment with Global, Grunzweig had managerial responsibility for numerous employees.  Grunzweig had access to Global's confidential and proprietary information and was responsible for generating and sustaining Global's goodwill and business relationships with its retail customers.  For example, Grunzweig helped build and maintain relationships with Global's current and prospective retail customers and partners and had access to Global's highly sensitive financial information and performance data, pricing information, sales and marketing plans, business and strategic plans, operations, and compensation information regarding Global's workforce.

8.

Throughout his employment with Global as a Senior Vice President, and to incentivize Grunzweig's performance, Grunzweig was highly compensated in salary, commissions, and valuable stock grants reserved for Global's senior executives.  Global brings this action based on Grunzweig's breach of the restrictive covenants contained in the following contracts between the Parties: (1) Restricted Stock Award Certificate dated March 23, 2017 (the "2017 Stock Award"); (2) Restricted Stock Award Certificate dated March 16, 2018 (the "2018 Stock Award"); (3) Restricted Stock Award Certificate dated March 15, 2019 (the "2019 Stock Award"); (4) Restricted Stock Award Certificate dated April 14, 2020 (the "2020 Stock Award I"); and (5) the Restricted Stock Award Certificate dated April 14, 2020 (the "2020 Stock Award II") (collectively, the "Agreements").  Authentic duplicates of the 2017 Stock Award, 2018 Stock Award, 2019 Stock Award, 2020 Stock Award I, and 2020 Stock Award II are attached hereto as Exhibits B, C, D, E and F, respectively.

9.

Specifically, in exchange for stock grants and other valuable consideration (which resulted in more than $500,000 in taxable income for him from 2018 to 2021 through the vesting of his restricted stock), Grunzweig promised in the Agreements, among other things, that for a limited period of 12 months following his separation from Global, he would not compete with Global by providing the same or similar services he provided to Global to its competitors within a defined geographic area.  *See* Ex. B § 15.1; Ex. C. § 15.1; Ex. D § 15.1; Ex. E § 15.1; Ex. F § 15.1.

10.

Despite these clear prohibitions, Grunzweig informed Global that he intends to start working for a competitor, Aptos LLC ("Aptos") as its General Manager – Americas in April 2021.

Aptos, like Global, is in the payment technology and digital commerce industry and, according to its website, offers to drive its customers' businesses "to new heights through global growth."[1] Specifically, Aptos offers its enterprise-level retail customers "[a] singular commerce platform" that provides "fluid, integrated processes, from inventory management to the point-of-sale and beyond."[2]  Aptos provides this singular retail platform to enterprise customers operating in multiple verticals, including apparel, cosmetics, hospitality, jewelry, grocery and drug, sporting goods, and manufacturing and wholesale.[3]  Upon information and belief, as General Manager – Americas, Grunzweig will be performing the exact same (or substantially similar) duties for Aptos that he performed for Global, including leading and expanding the strategic direction and overall management of Aptos' retail management solutions platform, which competes directly with Global's own platform.

11.

By accepting employment with Aptos, Grunzweig has breached the Agreements with Global, damaging Global and entitling it to preliminary and permanent injunctive relief to prevent unfair competition by Grunzweig and irreparable harm to Global.

**PARTIES**

12.

Global Payments Inc. is a Georgia corporation with its principal place of business in Atlanta, Georgia.

---

[1] https://www.aptos.com/company/ (last visited Mar. 29, 2021).
[2] https://www.aptos.com/solutions/#solution_industries (last visited Mar. 29, 2021).
[3] *Id.*

13.

Upon information and belief, Grunzweig is a citizen of Ohio who resides at 36311 Blue Grass Oval, Solon, Ohio 44139.

## JURISDICTION, VENUE, AND GOVERNING LAW

14.

This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because there exists complete diversity of citizenship between the parties (Georgia and Ohio) and the amount in controversy exceeds $75,000.  Specifically, Global seeks to recover from Grunzweig significant compensation and stock it paid to Grunzweig, which totaled more than $500,000 in taxable income from 2018 through 2021, as consideration for the restrictive covenants he has violated, as well as attorneys' fees and costs associated with enforcing the restrictive covenants. In addition, to the extent Global obtains the preliminary and permanent injunctive relief it seeks in this action, Grunzweig will be prohibited from working for Aptos, and will result in Grunzweig's loss of, on information and belief, in excess of $75,000 in salary and other compensation. Regardless, the combined value of the injunctive relief and damages Global seeks far exceeds $75,000.

15.

This Court has personal jurisdiction over Grunzweig because he consented to personal jurisdiction in the 2020 Stock Award I and the 2020 Stock Award II. Ex. E § 11 ("Grantee hereby agrees and submits to jurisdiction in the state or federal courts located in Muscogee County in the State of Georgia and waives objection to such jurisdiction."); Ex. F § 11 (same).

16.

Grunzweig is also subject to personal jurisdiction in this Court because he was employed by a company with a principal place of business in Georgia, contracted with Global in Georgia (including, but not limited to, the terms and conditions of the Agreements), communicated with Global's employees in Georgia, and accessed Global's competitively sensitive confidential business and financial information and trade secrets located in Georgia.

17.

Venue is proper in this Court because the parties signed binding forum-selection clauses designating this Court as the proper forum for resolving this dispute.  Ex. B § 11; Ex. C. § 11; Ex. D § 11; Ex. E § 11; Ex. F § 11.

18.

Under the Agreements, this action is governed by Georgia law.  Ex. B § 11; Ex. C. § 11; Ex. D § 11; Ex. E § 11; Ex. F § 11.

19.

Georgia has a legitimate and material interest in enforcing restrictive covenants entered into by companies that are headquartered here.  Given that Global is headquartered in Georgia, and has significant business operations in Muscogee County, there is a valid and legitimate basis for the Agreements to have a Georgia forum selection clause and choice of law provision.

## GRUNZWEIG'S EMPLOYMENT WITH GLOBAL

20.

The payment technology and digital commerce industry is highly competitive.  Companies like Global and Aptos compete directly for customers such as small merchants, mid-size companies, large corporations, educational institutions, and not-for-profit organizations.  For that

reason, Global's confidential, proprietary, and other nonpublic information, and its goodwill, investments of time and money in training its executives, and its customer relationships, are highly valuable. The foregoing includes, but is not limited to, Global's (i) contracts and relationships with its employees and customers, (ii) pricing, volume, margin, and other financial information, (iii) strategic business and marketing plans, and (iv) sales and employee compensation information.

21.

From April 2016 until March 2019, Grunzweig was employed by Global as a Senior Vice President of Retail for Heartland Commerce and as a Senior Vice President of Retail & International Divisions for Xenial Inc., a division of Global, following the rebranding of Heartland Commerce. In these roles, Grunzweig was a leader of Global's retail solutions platform business, including its point-of-sale hardware and software systems for retail customers. Specifically, as the Senior Vice President for Heartland Commerce, Grunzweig was responsible for Heartland's domestic retail strategy and executions, both prior to and after its merger with Global. Additionally, Grunzweig, among other duties, managed and supervised numerous Global employees. Grunzweig was also directly involved in the strategic planning of Global's overall sales strategy and revenue generating operations with respect to its retail management solution lines of business, including, after 2018 and Heartland Commerce's rebranding as Xenial Inc., in non-U.S. regions such as Europe, Canada, and Asia. From April 2019 until the present, Grunzweig worked for Global as a Senior Vice President, Food Service Management Business Unit, where he was responsible for providing strategic direction and planning for the Food Service Management Business Unit's overall sales and revenue generating operations, including sale of self-service kiosks, point of sale software and hardware solutions, and back office and analytical solutions for

retail customers, restaurant brands, food service providers, and other similar industries.

22.

In these roles, Grunzweig had access to and knowledge of Global's confidential and proprietary information, including, but not limited to, Global's most closely guarded confidential and proprietary financial and strategic information, as well as other confidential information regarding Global's relationships, customers and prospective customers, sales and marketing plans, business and strategic plans, operations, and sales workforce.

23.

In 2017, 2018, 2019, and 2020, Grunzweig accepted five separate grants of restricted Global stock pursuant to terms and conditions that apply to Global's executives. Grunzweig's receipt of the stock allocated under the Agreements was conditioned upon his agreement to the terms and conditions set forth in each of those agreements, including certain restrictive covenants.

24.

In the Agreements, which contain substantively identical language, Grunzweig acknowledged and agreed that he would have access to Global's confidential and trade secret information and that the restrictive covenants to which he agreed were fair, reasonable, and necessary to protect such information:

> As a condition of Grantee's receipt of this Award, Grantee agrees to the following restrictions. Grantee acknowledges and agrees that as a result of Grantee's employment with the Company or an Affiliate, Grantee's knowledge of and access to confidential and proprietary information, and Grantee's relationships with the Company's or its Affiliate's customers and employees, Grantee would have an unfair competitive advantage if Grantee were to engage in activities in violation of this Agreement. Grantee also acknowledges and agrees that the covenants in this Section 15 are necessary to protect the trade secrets of Company.

Ex. B § 15; Ex. C § 15 (same); Ex. D. § 15 (acknowledging that "covenants in this Section 15 are necessary to protect the trade secrets of Company or an Affiliate"); Ex. E § 15 (expanding

acknowledgment and agreeing "that the covenants in this Section 15 are necessary to protect the confidential information, trade secrets and goodwill of Company or an Affiliate"); Ex. F § 15 (same).

25.

In the Agreements, Grunzweig further agreed not to work for a competitor of Global for a period of twelve months after his employment with Global ended:

> During the term of Grantee's employment and for a period of twelve (12) months immediately following the termination of Grantee's employment for any reason, Grantee shall not, directly or indirectly, seek or obtain any employment or independent contractor relationship with a Competitor in the geographic area as to which Grantee has authority, has duties or conducts business for the Company or an Affiliate, which consists of the geographic area in which the Company or an Affiliate conducts business, in which relationship Grantee has duties for (or provides services to) such Competitor that relate to Competitive Services and are the same or similar to those services actually performed by Grantee for the Company; provided, however, that nothing in this Section 15.1 shall prohibit Grantee from acquiring or holding, for investment purposes only, less than five percent (5%) of the outstanding publicly traded securities of any corporation which may compete directly or indirectly with the Company.

Ex. B § 15.1; Ex. C. § 15.1 (same); Ex. D § 15.1 (expanding scope to "employment, independent contractor or consulting relationship with a Competitor or otherwise provid[ing] any form of assistance or services to a Competitor, whether paid or unpaid . . . that relate to Competitive Services and are the same or similar to those services actually performed by Grantee for the Company or an Affiliate."); Ex. E § 15.1 (same); Ex. F § 15.1 (same).

26.

The Agreements defined "Competitive Services" as follows:

> [S]ervices competitive with the business activities engaged in by the Company or an Affiliate as of the date of termination of Grantee's employment for any reason or any earlier date of an alleged breach by Grantee of the restrictions in Section 15 hereof, which include, but are not limited to, the provision of products and services to facilitate or assist with the movement in electronic commerce of payment and financial information, merchant processing, merchant acquiring, credit and debit transaction processing, check guarantee and verification, electronic authorization

10

and capture, terminal management services, purchase card services, financial electronic data interchange, cash management services, and wire transfer services.

Ex. B § 15.4(a); Ex. C § 15.4(a) (same); Ex. D § 15.4(a) (same); Ex. E § 15.4(a) (altering scope to include "provision of products and services to facilitate or assist with the movement in electronic commerce of payment and financial information, merchant acquiring, demand deposit accounts and other financial service solutions to the underbanked and other consumers and businesses, payment solutions to card issuers, and software, payroll and processing solutions. The foregoing list is not exhaustive."); Ex. F § 15.4(a) (same).

27.

The Agreements defined "Competitor" as follows:

any individual, corporation, partnership, joint venture, limited liability company, association, or other entity or enterprise which is engaged, wholly or in part, in Competitive Services, including but not limited to the following companies, all of whom engage in Competitive Services (and all of their parents, subsidiaries, or affiliates who engage in Competitive Services) and all of the successors in interest to any of the foregoing: TSYS Acquiring Solutions, Chase Paymentech Solutions, First Data Corporation, Total System Services, Inc., Vantiv, Wells Fargo Merchant Services, First National Merchant Solutions, RBS Lynk, TransFirst Holdings, iPayment, Bank of America Merchant Services, NPC, Elavon, Moneris Solutions, and Worldpay.

Ex. B § 15.4(b); Ex. C § 15.4(b) (similar); Ex. D § 15.4(b) (similar); Ex. E § 15.4(b) (noting that competitors included "Fiserv, Inc., Fidelity National Information Services, Inc., Chase Paymentech Solutions, LLC, Wells Fargo Merchant Services, LLC, RBS Lynk, Paysafe Group, Bank of America Merchant Services, LLC, Elavon, Inc., Square, Inc., Green Dot Corporation, InComm Financial Services, Inc., and EVO Payments, Inc. The foregoing list is not exhaustive."); Ex. F § 15.4(b) (same).

28.

In the Agreements, Grunzweig further acknowledged and agreed that if he breached or threatened to breach the restrictive covenants contained therein, "the Company shall be entitled to

enjoin, preliminarily and permanently, Grantee from violating or threatening to violate the covenants . . . it being agreed that any breach or threatened breach of the covenants would cause irreparable injury to the Company and that money damages would not provide an adequate remedy to the Company." Ex. B § 15.5; Ex. C § 15.5 (same); Ex. D § 15.5 (same); Ex. E § 15.5 (same); Ex. F § 15.5 (same). The Agreements also provided for tolling of Grunzweig's non-competition (and other) obligations during the pendency of any breach of the same. *See* Ex. B § 15.7; Ex. C § 15.7 (same); Ex. D § 15.7 (same); Ex. E § 15.7 (same); Ex. F § 15.7 (same).

**GRUNZWEIG ACCEPTS EMPLOYMENT WITH APTOS, A DIRECT COMPETITOR**

29.

Although Grunzweig's non-competition covenants barred him for working for a competitor for 12 months, in March 2021, Grunzweig informed Global that he has accepted a position with Aptos and intends to start working for Aptos as a General Manager responsible for its Americas operations, the exact same geographic area in which he worked and for which he had responsibility while employed by Global.

30.

Aptos directly competes with Global, including through offering retail payment technology services and digital commerce solutions throughout North America and across the globe, the precise services for which Grunzweig was responsible in his roles at Global.

31.

Aptos, like Global, is in the retail payment technology and digital commerce industry and, according to its website, offers to help its customers "expand[] your reach across the globe."[4] Like Global, Aptos provides integrated point-of-sale payment solutions for retailers operating in

---

[4] https://www.aptos.com/solutions/point-of-sale/ (last visited Mar. 29, 2021).

multiple verticals.  Aptos, like Global, provides services across a range of channels to retail merchants and customers, including, but not limited to, integrated point-of-sale payment solutions, employee management, inventory management, and customer analytics and reporting.  Indeed, Aptos' website design and content is substantially similar to Global's.  *Compare* https://aptos.com/ (last visited Mar. 29, 2021) *with* https://www.heartlandretail.us/ (last visited Mar. 29, 2021).

32.

Upon information and belief, Grunzweig will be performing the same or substantially similar services for Aptos as a General Manager - Americas as he did for Global.

33.

By accepting employment with Aptos, Grunzweig is in breach of the non-competition covenants contained in the Agreements.  As a result of Grunzweig's violation of the non-competition covenants, Global is entitled to preliminary and permanent injunctive relief to prevent irreparable harm to Global and to prevent Grunzweig from competing unfairly and to recover damages from Grunzweig.

34.

Upon information and belief, Grunzweig has violated other provisions of the Agreements, further damaging Global and supporting its request for preliminary and permanent injunctive relief.

## COUNT I

## BREACH OF CONTRACT – THE AGREEMENTS

35.

Global incorporates by reference the allegations contained in paragraphs 1 through 34 above as if they were restated verbatim.

36.

Grunzweig and Global entered into the Agreements, each of which is a valid and enforceable contract.  At all relevant times, Grunzweig was an "employee" of Global, as defined in O.C.G.A. § 13-8-51(5).

37.

The Agreements prohibit Grunzweig from working for a competitor such as Aptos for a period of twelve months after his employment with Global ends.   Ex. B § 15.1; Ex. C § 15.1; Ex. D § 15.1; Ex. E § 15.1; Ex. F § 15.1.

38.

Grunzweig expressly agreed that the restrictions contained in the Agreements are fair, reasonable, and necessary to protect Global's legitimate business interests, including, but not limited to Global's trade secrets, valuable confidential information, substantial relationships with Global's existing or prospective customers and clients, and customer goodwill associated with Global's ongoing business.  *See* O.C.G.A. § 13-8-51(9).   In the course of his employment, Grunzweig had the primary duty of managing Global's business and a customarily recognized department or subdivision of Global, a role in which he customarily and regularly directed the work of numerous employees and had the authority to hire and fire employees.  Grunzweig also performed the duties of a "key employee" and an "executive employee" as defined in O.C.G.A. § 13-8-51(7-8).

39.

Although Grunzweig is prohibited from providing the same or similar services that he provided to Global to a competitor for a period of twelve months after his employment with Global ended (*i.e*., until approximately April 2022), Grunzweig intends to start work for Aptos, one of

Global's competitors, immediately after leaving Global's employ, working in the same geographic area in which he was employed by Global and performing the same or substantially similar services for Aptos as he did for Global.

40.

Grunzweig has breached the non-competition provisions of the Agreements by accepting employment with Aptos as described in this Complaint.

41.

Global has been and continues to be harmed by Grunzweig's breaches of the Agreements.

42.

The damages Grunzweig has caused and will cause by breaching the Agreements cannot be fully remedied by monetary damages; *i.e.*, they are irreparable.  Indeed, Grunzweig specifically acknowledged and agreed in each of the Agreements that his breach of the non-competition or other restrictive covenant provisions contained in the Agreements would cause immediate, irreparable, and continuing damage to Global for which no adequate remedy at law exists.  *See* Ex. B § 15.5; Ex. C. § 15.5; Ex. D § 15.5; Ex. E § 15.5; Ex. F § 15.5.  Grunzweig further acknowledged and agreed in each of the Agreements that Global is entitled to preliminary and permanent injunctive relief in the event he violates the non-competition or other restrictive covenants contained in the Agreements.  *Id.*

## COUNT II

## INJUNCTIVE RELIEF

43.

Global incorporates by reference the allegations contained in paragraphs 1 through 42 above as if they were restated verbatim.

44.

As Grunzweig has agreed, his violation of the restrictive covenants contained in the Agreements has caused and will cause Global irreparable and immediate injury, loss, and damage, for which it has no adequate remedy at law.

45.

Unless Grunzweig is preliminarily and permanently enjoined and restrained, there is a substantial threat that he will continue to violate the restrictive covenants contained in the Agreements, causing further irreparable injury to Global.

46.

There is a substantial likelihood that Global will prevail on the merits of the dispute given that the restrictive covenants contained in the Agreements are reasonable and necessary to protect Global's legitimate business interests and they fully comply with the Georgia Restrictive Covenants Act ("GRCA"), O.C.G.A. § 13-8-50, *et seq*.

47.

The threatened harm to Global without an injunction prohibiting Grunzweig from committing further breaches of the Agreements far outweighs any potential harm to Grunzweig if he is enjoined.

48.

Enjoining Grunzweig from further breaching the Agreements will not be adverse to the public interest.  Indeed, when the Georgia legislature enacted the GRCA, it recognized that the public interest would be served through the enforcement of restrictive covenants like those contained in the Agreements against former employees like Grunzweig.  *See* O.C.G.A. § 13-8-50 ("The General Assembly finds that reasonable restrictive covenants contained in employment and

commercial contracts serve the legitimate purpose of protecting legitimate business interests and creating an environment that is favorable to attracting commercial enterprises to Georgia and keeping existing businesses within the state.").

49.

Global requests that the Court preserve the status quo by entering a temporary, preliminary, and permanent injunction against Grunzweig to restrain and enjoin him from (a) continuing his employment with Aptos or performing any services for Aptos that would violate or potentially violate the restrictions on competition contained in the Agreements and (b) taking any other action that would violate the restrictive covenants contained in the Agreements.

50.

Global also requests that the Court enter an order tolling the time periods applicable to the restrictive covenants contained in the Agreements beginning from the date Grunzweig first violated those covenants through the latest date specified for tolling in the Agreements.

## COUNT III

## ATTORNEYS' FEES

51.

Global incorporates by reference the allegations contained in paragraphs 1 through 50 above as if restated verbatim.

52.

Global is entitled to recover its attorneys' fees and other reasonable expenses incurred in connection with this litigation pursuant to the Agreements and pursuant to O.C.G.A. § 13-6-11 because Grunzweig has acted in bad faith and been stubbornly litigious in his performance of the Agreements and has caused Global unnecessary trouble and expense.

## **PRAYER FOR RELIEEF**

WHEREFORE, Global prays for the following relief:

(a)     A bench trial on all issues so triable;

(b)     Judgment to be entered in favor of Global and against Grunzweig for damages in an amount greater than $75,000 to be determined at trial, including pre- and post-judgment interest;

(c)     For preliminary and permanent injunctive relief as follows:

(1) Prohibiting Grunzweig from commencing his employment with, and performing any services for, Aptos or any other competitor that would violate or potentially violate the restrictions on competition contained in the Agreements;

(2) Prohibiting Grunzweig from taking any other action that would violate the restrictive covenants contained in the Agreements; and

(3) Tolling the time periods applicable to the restrictive covenants contained in the Agreements beginning from the date Grunzweig first violated those covenants through the latest dates provided for in the Agreements.

(d)     That Global be awarded its expenses of litigation, including reasonable attorneys' fees and costs; and

(e)     The Court award such other and further relief as the Court deems just and appropriate under the circumstances.

Dated: April 2, 2021

/s/ Nathan D. Chapman
Nathan D. Chapman (Georgia Bar No. 244954)
Andrew M. Swindle (Georgia Bar No. 522156)
KABAT CHAPMAN & OZMER LLP
171 17th Street NW, Suite 1550
Atlanta, Georgia 30363
Telephone: (404) 400-7300
Facsimile: (404) 400-7333
nchapman@kcozlaw.com
aswindle@kcozlaw.com

*Attorneys for Plaintiff*